You may proceed. Thank you, Your Honor. And may it please the Court, my name is John Walker of Sonnenschein-Knapp and Rosenthal, attorney for the petitioners and appointed pro bono counsel. I have with me Bona Ekpebi and Laura Weitzmer from my office, and also in the audience are Mr. Ayvazyan and his daughter Alveda. Since Mr. Ayvazyan does not speak English, I have asked Alveda to keep him advised of what's going on in court, so if there is some speaking in the background, I'm to blame. I hope the Court will consent. That's fine. Thanks for the introductions. Thank you. Also, I need to point out that on Friday we filed with Ms. Katterson a Federal Rule of Appellate Procedure 28J letter bringing to the Court's attention a recent decision. That decision was Kumar v. Gonzalez. Citation is 435 Fed 3rd 1019, decided on January 23, 2006. We sent it to Ms. Katterson by Federal Express, so it probably arrived yesterday. I have copies. I'm not sure if the Court has had an opportunity to get it, but I would like to give copies to Mr. Wagoner if it's appropriate. Certainly, after your argument. Okay. Thank you. I'd like to begin by saying something about the Kumar case, because we think it stands for a legal proposition that should govern the outcome of this case as a matter of law. The specific citation to the Kumar case is page 1026, and it's there that the majority points out that one of the important duties of an immigration judge below is to fully and fairly develop the record so that when cases get up to the Board of Immigration Appeals and ultimately to the Ninth Circuit, we can all feel confident that we're dealing with all of the relevant facts, particularly where the outcome of the case is largely hinged upon an adverse credibility determination, and that's the type of case that we have here. The Kumar case essentially says the immigration judge must do three things in order to comport with due process. One, if a discrepancy is deemed by the immigration judge to be material enough to support an adverse credibility determination, that deficiency or discrepancy must be brought to the asylum seeker's attention. The asylum seeker must be given an opportunity to explain the discrepancy. And then finally, if the immigration judge is going to go ahead with an adverse credibility determination, the explanation must be discussed in either the oral ruling or the written ruling that the immigration judge comes out with. Now, why is that important? I want to give the Court a concrete example from this case as to why I think the failure to present Mr. Ivogin with the discrepancies in the record that made up the adverse credibility determination leads to error in this case and why Mr. Ivogin was deprived of due process. The very first discrepancy that the immigration judge identifies in her ruling is that Mr. Ivogin said in his written asylum application during 1995 incarceration he had stripes cut into his chest with a piece of sharpened metal. Then the immigration judge points out that there was no specific reference to that traumatic and persecutorial event during the Mr. Ivogin's testimony before the immigration judge. Is that the discrepancy or is the discrepancy between what was said in the asylum application and the nature of the injuries that he testified to during the hearing? Well, the nature of the injuries he testified to are sort of twofold. Well, it's cuts versus burns. Well, he didn't testify as to burns. There were some burns referenced in the medical record. Your Honor is correct, but I don't think Mr. Ivogin gave any testimony about any burns. But wasn't the IJ's concern with regard to the discrepancy between the description contained in the asylum application and his oral testimony about those particular injuries? That's correct, and that's what I want to address. Well, let me ask you then the follow-up question, and you can work it into your answer. I'm trying to understand where the petitioner actually testifies about that particular act of persecution, and the asylum application is itself admitted as part of the evidence in the case. How is this any different from evidence offered in any other kind of an adversary proceeding where the finder of fact compares the evidence that is introduced in written form with the oral testimony of the witness in making a credibility determination as to whether or not the witness testified truthfully about the event? Well, I have two responses. One, it's not an inconsistency in the sense that in one situation Mr. Ivogin testified black, and in another context he testified white. Mr. Ivogin ---- The immigration judge thought so, didn't she? Yes, but I think that's error, because she ---- Well, is it error in ---- I'm trying to ---- are you trying to characterize the difference? I guess the question I'm struggling with is your due process argument. How much process is due where a witness is given an opportunity to testify about the same event that is covered in the written asylum application, and the fact finder weighs the two pieces of evidence in deciding whether or not the witness is testifying truthfully? How is due process offended by having the opportunity to testify? The due process is one question. Mr. Ivogin, there's a discrepancy here. Do you have an explanation? And that's what Kumar says due process requires. I can represent to the court that if that question had been asked of Mr. Ivogin during the immigration proceeding below, he could have taken off his shirt and shown the scars from being cut by the pieces of sharpened metal. Didn't his lawyer have the opportunity to do just that? In other words, the client was there, the issue was raised before the immigration judge, and a well-prepared advocate would certainly have considered asking the court to view the nature of the injury. In good conscience, I can't disagree with what you just said, because my first question when I reviewed the file was what gives. There's a discrepancy here between the description in the asylum application and the testimony. But we're dealing with a fundamentally different procedure in an immigration proceeding. A fundamentally different procedure or the same due process clause? Well, the immigration judge has different duties than a judge in a normal, let's say, district court setting. So Fifth Amendment applies differently in immigration proceedings than it does in a normal trial for a civil jury? Where an immigration judge has a duty to develop the underlying record and elicit the facts and circumstances from the asylum seeker in order to have a full and fair record developed below, yes, due process requires that that extra question be asked. What's the role of the Petitioner's lawyer? Well, the Petitioner's lawyer should be to do the best job that he or she can in eliciting the facts of persecution and presenting it to the immigration judge. So is the problem with the immigration judge or with the Petitioner's lawyer? Is that how due process has been violated here? There's a shared duty below, a shared duty, Judge Tallman, and I think that's what the Kumar case is getting at when they say that before the immigration judge is going to base an adverse credibility determination on a discrepancy in the record, you have to ask one question. What was the reason? Because there could be a very plausible explanation. Maybe some of the things that you're mentioning, a lawyer perhaps not being as active as he or she should be is a part of the reason for the record not being properly developed. But when the immigration judge also has that duty to develop the record, we think Kumar and due process dictate there needs to be that extra question asked. So we're not faced with questions when we get up to this stage as to what may or may not have happened below if that question had been asked. And I know where Your Honor is coming from. I know that you think that finality and deference to the immigration judge are important considerations. I've read that. Be careful, counsel. Just because I asked a question doesn't necessarily mean how I'm going to vote on the case. No, but I have read some of your opinions and I've read them with care. But paramount to those notions of finality and deference, I think, are to get the ruling right in the very first instance. And I think the Kumar case will serve this, the Ninth Circuit, very well by ensuring that immigration judges have a full and fairly developed record later. How does this differ, though, from a civil bench trial where the judge is also the trier of fact? There's no obligation on behalf of the trier of fact in a civil bench trial to develop the record. Because the party is represented by a lawyer who has the obligation to carry its burden of proof, right? Well, that's part of it. But also there's a specific CFR statute applicable to immigration judges that explains or directs them to ask questions, develop the record, emit evidence, et cetera. I see I'm down to about 30 seconds. I'd like to save that for rebuttal. Mr. Campbell? May it please the Court. My name is Isaac Campbell, and I represent the United States in this matter. Your Honors, in this case, lead petitioners failed to meet his burden establishing eligibility for asylum. And the pertinent issue before this Court is whether substantial evidence requires this Court to grant asylum to or to reverse the decision of the administrative judge. By way of roadmap, I'd like to first discuss why substantial evidence supports the immigration judge's decision. Then I'd like to address Petitioner's due process argument, and then finally address Petitioner's request for this Court to take administrative notice of a document, 2003 report. Before I get started, why don't we start with the argument that Mr. Walker made about Kumar. And I think that's uncontroversial that there is a duty on the part of the immigration judge to develop the record. Do you agree with that? Certainly not. And I think in this case that the record has been developed. I think at the heart of the ---- Let's take the burn testimony or lack of burn testimony. What the argument is that appears to be on that particular discrepancy is that his asylum application talked about receiving cuts and a medical report referenced burns. And it seems to me that what Mr. Walker was arguing was that his client did not have an opportunity to address that because he did not know that that was a credibility concern of the immigration judge. That's the way I understand his argument. How do you respond to that? Well, I would say I respond to that in two ways, Your Honor. I think, first, there was substantial discussion about the immigration judge and Petitioner about the circumstances surrounding his being beaten in prison. In fact, one of the arguments that Petitioner makes is that the immigration judge was, in fact, too involved in the questioning. Now, to the extent that the immigration judge did not ask, specifically did not say that there ---- here is this medical testimony and here is what ---- and there is this omission where you didn't refer to this, and then there is this issue with the medical report where there seemed to be contradictory information. The immigration judge did not ask that specifically that way. But there was the issue surrounding the reported beating that the Petitioner suffered was discussed, I would say, quite exhaustively. In fact, so much so that Petitioner argues that the immigration judge was too involved with the questions. The point is, and this is the one I'd like you to address, is that I grant all of what you say. But I think the point that Mr. Walker is making is that if you're going to base an adverse ---- a specific adverse credibility finding based on something in the record other than what's apparent, that the immigration judge ought to allow the applicant to respond. In other words, the argument would go that in this case, what should have happened is the immigration judge should have said, your medical ---- the medical report here references burns and your asylum application says you were cut. Those seem to be inconsistent to me. What is your explanation? And I gather you concede that didn't happen, but instead argue that it was more generally discussed and so it's a fair characterization. Is that the gist of your argument? Certainly, Your Honor. And I would also add that there were certain inconsistencies that the immigration judge relied on, which she did specifically discuss. For example, one of the things that the immigration judge talked about was the fact that the Petitioner stated that he, that his wife, that he, his wife and his son were all beaten. But when he testified, he said that his wife wasn't beaten. At page 166 of the record, the immigration judge did talk about or try to get clarification regarding whether or not the wife was present. So that for some of the inconsistencies, the immigration judge did raise that specifically. But as to the specific issue you raised about the burns versus cuts, I submit that while the immigration judge did not ask that for specific clarification in that regard, that that issue was explored exhaustively such that Petitioner could have raised that issue. And it did, there was, he did receive a full and fair hearing, which is what due process requires, as much as Petitioner was afforded the opportunity to discuss that issue. Well, go ahead. As I understand Mr. Walker's argument, though, Kumar dictates actual confrontation. I think his position, as I understand it, is that in immigration proceedings, because of the existence of the regulation, the immigration judge has to do more. The immigration judge has to specifically confront the witness with the discrepancy and give the witness an opportunity to explain it before the immigration judge may properly consider that particular fact as a means of discrediting the testimony of the Petitioner. I would respond to that, Your Honor, by saying that I think that, as I understand what Kumar does raise that issue, I think the spirit of what is intended is that the Petitioner be given, as is required in due process, a full and fair hearing where the Petitioner has the opportunity to raise that issue. And I submit that Petitioner had the opportunity to do so here. While I agree that the immigration judge has some ability to develop the record, I think that what Petitioner suggests in some ways might be to shift the burden unfairly onto the immigration judge. I think that Petitioner was represented by counsel. Petitioner had the opportunity to raise that issue. This issue was discussed exhaustively, and that Petitioner had the opportunity to raise that issue. And I don't think that — and I would submit, Your Honor, that it is not — it does not deprive Petitioner of due process. When the immigration judge did raise some issues, they were squarely addressed. In the particular issue Your Honor has raised, the issue was discussed. And while that specific question was not answered, the issue surrounding the purported abuse was discussed exhaustively to the point that Petitioners argue that the IJ was too involved with the questions. And so to the extent that the immigration judge did develop the issues, I think that that satisfies the due process that Petitioner is entitled to, and Petitioner was given a full and fair hearing and, therefore, was not deprived of due process. What other material inconsistencies would you cite to us if we were to exclude consideration of the Burns versus Cutts factor? I would — there are three, Your Honor. Well, to the extent that I think that — well, first, discussing the Burns, I think there are two issues on that issue. First, there was the fact that the Petitioner omitted that issue in his testimony. If that were excluded, there is still the contradiction between the medical records and the asylum application in which the asylum application claimed he was cut, but that the medical record is devoid of any treatment for that and, in fact, discusses Burns. I think we've — I think we've exhausted that issue. Why don't you respond to that? Yes. Tell me what other factors support a material — a finding of material inconsistency. Certainly, Your Honor. The — the asylum application stated that Petitioner had been contacted by the Armenian authorities for additional extortion money. However, when he testified, he testified that it was, in fact, his son that had been contacted by the authorities. He mentioned that in his administrative — in his asylum application that he, his wife and his son were all beaten before being taken to the police station. But when he testified, he testified that only he and his son, not his wife, was beaten. And, in fact, the I.J. did attempt to clarify that and raise that issue. There are also, in addition to inconsistent — he testifies in his — he testifies that, in fact, he was extorted, and then they called the son back. Why is that an inconsistency? Because in his asylum application, he specifically stated that he was contacted by these authorities to provide this additional money. However, when he testifies, he now states that it was his son that was contacted. Well, he doesn't — he says — he adds that his son was contacted, but he also says that he was extorted in his testimony, doesn't he? I mean, the question is, what did you tell him at this time? Did you tell him anything in response? Answer, I don't have more than $1,700. That's it. He's responding to their questions. So where's the inconsistency? Well, the inconsistency, I would submit, Your Honors, in the application, where he fails to mention anything about — in his application, he mentions that he was the one that was being contacted and told he had to provide the money. Right. But his testimony says, they talked to me first, and then they called my son back. I would — Why is that inconsistent? I would submit that the way that that was provided in his asylum application, the phrase is slightly different. But even beyond that particular issue, there was the issue with respect to his wife, and mentioning that she had been beaten, and then it was contradicted in his testimony. There were also omissions in — But where did he say that she wasn't beaten? One moment, Your Honor. He talked about his son, he and his son being beaten. But I didn't see the question being asked, was your wife beaten? In — and on the administrative record at page 377, he states that his — he, his wife, and his son were all beaten before being transported to the station. Right. That's in his application. And at the administrative record at pages 164 to 67, he testified that only he and his son were beaten, not his wife, and that the assault occurred at the police station. I see my time is — Oh, that's right. You can finish your thought. But with respect to — so in terms of those pages, that's where the inconsistency lies. There are also material omissions in the argument that support the administrative judge's decision, which he claims that during his testimony, that during the time, the 10-year period he was in Armenia, there were religious gatherings that he attended that were raided at a minimum of five to six times. Yet when he, in his asylum application, these additional raids at which he was there and members of his faith reportedly detained, these raids were not mentioned there. So in addition to the inconsistencies, there are also material omissions that go to his argument. And so with respect to — I don't think the I.J. relied on that, did he? That there were these other issues? Well, the I.J. did not. The I.J. talked about the burns. The I.J. talked about the wife being beaten. The I.J. talked about an inconsistency on the extortion. And the I.J. talked about the difference on the location of where he was beaten. I don't think the I.J. talked about the number of raids, did he? Actually, I thought the I.J. talked about it to the extent that the I.J. may not have relied upon that. It was simply another omission. But I would submit with respect to, in summation with respect to the substantial evidence supporting the immigration judge's decision, that there were inconsistencies and material inconsistencies and material omissions, such that the immigration judge reasonably found that Petitioner was incredible. Petitioner did not meet his burden of proof in demonstrating that he was a reliable and credible witness. And the pertinent issue is whether this Court is required to believe that Petitioner was a credible witness. I submit that what Petitioner provides to the Court is rationales for what could have happened, but it is not sufficient to meet Petitioner's burden where this Court is required to accept Petitioner's speculation in determining that Petitioner was a credible witness. And finally, in summation, just regarding the final two issues with due process, I would argue first that Petitioner has not shown that there is, has failed to meet his burden in showing there was a substantial prejudice and that there is not a due process violation with respect to the hearsay, with respect to the memo that was introduced. It is well established in this Court that simply because material is hearsay, that that in and of itself is not sufficient to preclude its admission. And in fact, in this jurisdiction, it's clear that hearsay is admissible if it's appropriate and its admission is fundamentally fair. So that responds to Petitioner's argument regarding due process. But more importantly, there was not a due process violation inasmuch as the judge was faced with two letters, both reportedly from the same individual, and the immigration judge gave no weight to either letter. And so because the judge did not rely on that document to the extent that it was hearsay, it still did not violate the process because the judge did not rely upon it in making his decision. And finally, with respect to the letter regarding that the Petitioner wishes to have this Court accept through judicial notice, we would note that the proper procedure for providing information is that if Petitioners are arguing that that information is not available, Petitioners have the ability to file a motion to reopen with the Board so that the Board could review this information first, that this Court is not a court of first review. The ---- That would be time-barred now, right? Excuse me, Your Honor? Would a motion to reopen be time-barred now? At this point, yes, Your Honor. However, the most of the report was provided at the end of 2003. The Board's decision came out on February 4th of 2005, such that a motion to reopen could have been done at that time. It could have been done in a timely fashion. I understand your argument. Thank you very much. We'll give you two minutes for rebuttal. You can put that on the clock, Rob. Thank you, Your Honor. Let me start just by giving the Court two authorities that I'd like the Court to consider, one of which is not cited in our papers, and that's a case called Stoyanov. You can give that to the Clerk afterwards, and the Clerk will distribute it. Okay. Thank you. Take up your time. I'd first like to respond to the judicial notice point that my adversary concluded with. There are really two cases for the Court to consider with respect to whether judicial notice should be given. The Fisher decision, which I concede presents a high burden to me for something being considered judicial notice at this point. But the position obviously I was put in as a pro bono counsel getting this case after the time to file a motion to reopen had expired, this is the best avenue I have. I would cite the leasing case as support for taking judicial notice. This is a really sui generis situation, I think. The report from the U.N. came out in 2003 after the immigration judge's decision, after the appeal to the BIA, after the appellate briefs were filed with the BIA, and at a time when my client, who speaks only Armenian, was representing himself, and the report is in English. So I think there are some considerations there for taking judicial notice. I would ask for the Court's indulgence. With respect to the duties of the immigration judge, I would also direct the Court to an important BIA decision called a matter of SMJ that's cited in our reply brief. Why don't you turn to the discrepancy about who was beaten on the way to the police station? That seems to be the one that the government centers on. Sure. I think this is an important one, and it really highlights why the Kumar decision makes sense. In the asylum application, I think the panel has to appreciate it. Is your position that he wasn't given an appropriate confrontation on that point? Yes, it is. I think the question that the immigration judge should have said, let me be direct, is, Mr. Ivashin, I perceive there are two, there's a discrepancy in your asylum application versus your testimony. Here's what it is and what concerns me. This could amount to an adverse credibility finding against you. What is your explanation? And then I think Mr. Ivashin could have given the appropriate explanation there. Practically, Mr. Walker, how does the IJ as the fact-finder do that in the middle of the testimony? Whatever happened to waiting until all the evidence is in before we weigh it and then try to figure out what the truth is? Well, I think it's a good question, because I think it does impose some burdens and challenges for the immigration judge. I guess the concern is it could impose an impossible burden on a fact-finder, because you might not know until after you've heard all the evidence and weighing it that there really is a serious problem. It is true that maybe when you're developing your decision, you identify a discrepancy, but I think there's a procedure for handling that, and that is to call even a telephonic hearing or another very short hearing to address the discrepancy. Does that require the IJ to sua sponte reopen the proceedings and call the parties back for further testimony? I think due process could require that, Your Honor. The answer is yes. Okay. With respect to the specific circumstance, though, the IJ did raise some concerns about the activities and what happened to his spouse during the questioning. Why wasn't that sufficient? Because the specific question wasn't asked. There's a discrepancy between your application and the oral testimony. What caused it? What's your explanation? And let me tell you what I think happened here, because I think it would be instructive for the Court. Mr. Ivashin, in having the asylum application prepared, wasn't represented by counsel. He speaks only Armenian. It's in the record that he had an acquaintance assist him with it. The acquaintance is charged with translating the Armenian into English, and then Mr. Ivashin ---- I don't think that that was raised in Mr. Ivashin's brief. Doesn't the Petitioner have a burden to exhaust that issue before he can properly raise it here? He said generally that the immigration judge seized upon inconsistencies that were not important in making the adverse credibility determination. How did we transform that argument into the interpreter didn't do an adequate job translating my testimony? Well, I guess what I'm saying is that if the immigration judge below confronts Mr. Ivashin with the discrepancy, he can say, well, this isn't exactly what I told the interpreter. What I told the interpreter was when we ---- Different question. My question is one of exhaustion of administrative remedies, and you want to go back to the due process issue. But it seems to me that due process door swings both ways. The regulation says that he has to present this clearly and squarely in his appeal to the BIA. And my question is, did he? And it doesn't sound like he did. Well, my response to that is I don't have firmly enough in mind his brief to the BIA as I stand here to directly answer it. It's a short brief, but I would say it's dated generally enough. And giving consideration to Mr. Ivashin, who was representing himself at the time, I think that what the court should do is read it broadly enough to include the denial of due process as being an issue that he raised. That's the best answer that I can give to your question. But it's, I think, very often the case, and this, again, highlights the duty of the circumstances similar to Mr. Ivashin's can result in some discrepancies with the actual oral testimony that's given during the proceeding. And, again, it really hammers home why Kumar makes so much sense in terms of having a direct question by the immigration judge about the discrepancy, a chance to explain. And then there's no question when we get up to this stage as to whether or not there's a void in the record and whether or not we have all the facts that we need to know that justice is being served and that we're not perhaps deferring to the immigration judge in a context where the immigration judge didn't do their job. We don't have a fully developed record, and we may be getting to the wrong decision. Thank you. I want to thank you especially for taking on this pro bono case. It means a lot to the circuit that you do. And, of course, thank the government for coming out for D.C. to argue the case in person as well. Thank you. Thank you all.
judges: Thomas, Tallman. Fitzgerald